MEYER, Respondent, vs. CONWAY and others (TAX COMMISSION), Appellants.

*May 6—June 4, 1940.*

For the appellants there was a brief by the *Attorney General* and *Harold H. Persons,* assistant attorney general, and oral argument by *Mr. Persons.*

For the respondent there was a brief by *Lines, Spooner & Quarles,* attorneys, and *Charles B. Quarles* of counsel, all of Milwaukee, and oral argument by *Mr. Quarles.*

FOWLER, J. The Peshtigo Paper Company defaulted on its bonds. A receiver was appointed by the circuit court and the receiver operated the property for several years at a loss. A bondholders' committee was formed and the property bought in for the bondholders at a receiver's sale ordered by the court at which there were no other bidders, and the property was paid for by a cancellation of the bonds of which over a million dollars were outstanding. A reorganization was agreed upon and a new corporation was created with an authorized capital of 14,300 shares of preferred stock at $50 a share and 65,000 shares of nonpar common stock. The committee took 12,300 shares of the preferred and all of the common stock which it paid for by transferring the property to the new corporation, receiving one share of the preferred and one share of the common for each $100 of bonds. Only the nonpar stock carried the voting privilege.

The underwriters of the old bonds who were active for the bondholders in the reorganization interested the plaintiff Meyer, who was experienced in the paper-mill business, in

purchasing stock and taking over the management of the business of the new corporation. For $100,000 Meyer was to receive 2,000 shares of the preferred stock at $50 a share and 41,165 shares of the nonpar common stock of which 39,165 shares were to be placed in escrow. Of the common stock taken by the committee it transferred 41,165 to Meyer. Meyer retained 2,000 shares of the common stock in his possession and deposited 39,165 shares in escrow with three trustees of which he was one. This escrow agreement provided that the 39,165 shares of nonpar stock should be issued to the committee, by it transferred to Meyer and by him indorsed to the trustees, to be held by them subject to agreement that if the new company under the management of Meyer should earn $300,000 net profit within five years the stock should be delivered to Meyer or to his nominees and if such profit should not be earned within that period the stock should be delivered to the company.

The escrow agreement was executed December 29, 1928. In October, 1931, the other two trustees under the escrow agreement wrote Meyer that in their opinion the $300,000 net profits were reached on September 30, 1931, and that if the annual audit of December 31st so showed the 39,165 shares of nonpar stock would be "released." The audit so showed, and in February, 1932, the stock was delivered to Meyer.

Pursuant to a field audit there was assessed to Meyer an additional income tax for the year 1932 on $79,167.50 as representing the value of the nonpar stock received by the taxpayer on the ground that it was income received that year as a bonus for services theretofore rendered. On appeal by Meyer to the income tax board of review that additional tax was set aside. The Wisconsin Tax Commission reversed the board of review and confirmed the assessment. The circuit court reversed the Tax Commission and set aside the tax.

No procedural questions are involved. The sole questions are whether the $79,167.50 was income and if it was when it was received.

The position of the state is that when the stock was released to the taxpayer by the trustees who held it in escrow in 1932, it had a value of $79,167.50, and represented compensation then received by the taxpayer for services rendered during the years 1929 to October, 1931.

The position of the taxpayer is that this block of 39,165 shares of stock was delivered to him in January, 1929; that the title then passed to him; that the stock was put up in escrow as guaranty that under his management the company would earn $300,000 within five years, and if it did not the stock would then be delivered to the company; that the stock had no value when it was delivered to him and that what Meyer sells it for when he does sell it will be gain and then taxable as income.

The proposed plan of reorganization sent out to all bondholders signed by the underwriter of the old bonds acting for the bondholders' committee represented that "as part of the consideration [for the employment of Meyer and his putting $100,000 into the company], he [Meyer] and his associates have agreed to purchase, at par, $100,000 par value of the [preferred stock] and upon the accomplishment of prescribed results [earning $300,000 net profits within five years] in the management of the property he will receive a controlling interest in the common stock of the new company." This seems to support the position of the state, that Meyer was not to have the nonpar stock, except the 2,000 shares, until he had made the profits stated. It is also to be considered that a provision contained in the escrow agreement that in case of death of Meyer, if he should have made profits up to that time, stock should be delivered to his administrator according to the then earnings at a ratio specified

in a schedule incorporated in the agreement, is inconsistent with the contention of the respondent that the title to the stock was in Meyer. The title was in the trustees, else title to all of the stock would be in the administrator in case of Meyer's death, subject to distribution by the administrator as the court should decree under the contract. The question seems to be not one of technical title, but what do the integrated agreements of the parties taken and construed together show the intent of the parties to be? Do they show that if the company earned $300,000 Meyer would receive the stock as compensation or bonus in addition to the salary specified in one of the agreements, or do they mean that complete ownership was in Meyer, but that if he did not earn the $300,000 within five years complete ownership should be transferred by the trustees to the company?

The integrated agreements are evidenced by three instruments. Two of them bear date December 28, 1928. One of these is the escrow agreement, the contents of which are sufficiently stated above. The other of the same date, addressed to Meyer, signed by the chairman of the bondholders' committee and by Meyer as "approved," reads, so far as it relates to Meyer, as follows:

"The following is the initial basis of annual compensation which you and this committee have agreed upon for yourself and four associates who will constitute the skeleton of the new organization to take over the property of the Peshtigo Paper Company:

"To yourself, as president and general manager, a minimum annual base salary of $12,500, plus 4% of annual net profits in excess of $100,000."

The other agreement, dated January 28, 1929, is the stock subscription of Meyer. It recites that Meyer subscribes and agrees to pay par for 2,000 shares of the preferred stock at $50 per share "on the understanding and agreement" that the committee concurrently upon payment by Meyer of the $100,000 should assign to Meyer 41,165 shares of the nonpar stock, and that Meyer agreed upon receipt of the nonpar

stock to place in escrow, under the agreement of December 29, 1928, 39,165 shares thereof.

It is manifest that the three instruments above stated taken together constitute the contract between the new company and Meyer, and that they must all be considered together in construing the contract. They show that what Meyer was to receive for his payment of the $100,000 was stock as stated; was to be made president and manager of the new company; was to receive a stated salary of $12,500 per year, a percentage of profits over the sum stated; was to receive complete ownership of 2,000 shares of nonpar stock; was to receive complete ownership of the 39,165 shares of nonpar stock if within five years the net earnings of the new company amounted to $300,000. We consider that the nonpar stock was as much a part of the compensation of Meyer if he got it, as specified in the escrow agreement, as was the percentage of the profits on the earnings of the company each year if it earned profits over the stated sum. This view is supported, in principle, by *Helvering v. Clifford,* 309 U. S. 331, 60 Sup. Ct. 554, 84 L. Ed. 788; *Pearson v. McGraw,* 308 U. S. 313, 60 Sup. Ct. 211, 84 L. Ed. 293; *Higgins v. Smith,* 308 U. S. 473, 60 Sup. Ct. 355, 84 L. Ed. 406. Counsel for respondent cite *Schneider v. Duffy* (D. C., N. J.), 43 Fed. (2d) 642; *Platt v. Bowers* (D. C., S. D., N. Y.), 13 Fed. (2d) 951; *Saunders v. Comm'r of Internal Revenue* (3d Cir.), 29 Fed. (2d) 834, as to the contrary. None of the cases above cited by either side involves factual situations precisely like that here involved, but those of the supreme court of the United States seem to us to bear more directly upon the general principle of construction involved. Sec. 71.02, Stats., makes taxable as "gross income" all "wages, salaries or fees derived from services" and "all other gains, profits or income of any kind derived from any source whatever, except such as are hereinafter exempted." It is not claimed that the nonpar stock is exempted. The claim is that it is not taxable because it is neither compensation for serv-

ices nor gain from sales. Neither the valuation of the non-par stock fixed by the assessor, nor attributing the whole of that value to the respondent, is attacked in the brief of respondent, and we assume that both are supported by the record. It follows that the judgment of the circuit court should be reversed.

*By the Court.*—The judgment of the circuit court is reversed with directions to enter judgment confirming the tax as imposed by the assessor of incomes.